### THE AVALON.

### THE POWER LAUNCHES C. F. CO. NOS. 2, 3, AND 4.

(District Court, D. Maryland. October 28, 1913.)

COLLISION (§ 95*)—STEAMER AND TOW MEETING—NEGLIGENT TOWAGE.

A bugeye 58 feet long, with a large number of passengers, while being towed down the river from Baltimore by a gasoline launch made fast to her starboard quarter, came into collision with a meeting steamer, which had signaled to pass port to port. The launch was in such position that the only man in charge could not see the steamer, and neither he nor the master of the tow, who was also the owner, was paying any attention to the course, which up to immediately before the collision was being directed by another launch with a line ahead, which with a third one, all belonging to the same owner, had been voluntarily assisting with the tow, as they were for some distance going in the same direction. There was room to pass in safety, and one of the launches answered the steamer's signal, but before the collision both the volunteer launches cast off. *Held,* on the evidence, that the steamer was not in fault, having no reason to apprehend collision until it was too late to avoid it; that it was brought about by the smaller vessel changing her course to port, due probably to the casting off of the two launches, one of which had been on the port side of the tow, and that the tow and all the launches were in fault.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202; Dec. Dig. § 95.*]

In Admiralty. Petition by the Baltimore, Chesapeake & Atlantic Railway Company, as owner of the steamer Avalon, for limitation of liability; also against the power launches C. F. Co. No. 2, C. F. Co. No. 3, and C. F. Co. No. 4, and the Consolidated Ferry Company, their owner, and against Gustav Bembe as owner of the bugeye Elisha, for collision; also suit by said Bembe against the Avalon. Decree in favor of the Avalon against all the other vessels.

Beverly W. Mister, of Baltimore, Md., for master of Elisha.

Daniel H. Hayne, of Baltimore, Md., for Baltimore, C. & A. Ry. Co.

Arthur D. Foster, of Baltimore, Md., for Consolidated Ferry Company.

George T. Mister and James Fluegel, both of Baltimore, Md., for intervening petitioners.

ROSE, District Judge. On May 22, 1913, the steamer Avalon and the bugeye Elisha were in collision. They came together about a quarter of a mile southwest of Lazaretto Point in the Fort McHenry Channel. The Avalon belonged to the Baltimore, Chesapeake & Atlantic

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Railway Company. It was about 190 feet long. At its best speed it could travel 12 knots an hour. At the time of the collision it was on one of its regular trips to Baltimore. The Elisha was of nine tons gross and five net tonnage. It was about 58 feet long. It was not using either the power with which it was equipped or its sails. It was in tow of a gasoline launch known as C. F. Co. No. 4. Up until almost the very instant of the collision two similar launches, the C. F. Co. No. 2 and the C. F. Co. No. 3, had been assisting in towing it. All three of the launches belonged to the Consolidated Ferry Company, a Maryland corporation. The Elisha was in charge of its master, one Gustav Bembe. He was also its sole owner. It is customary in the month of May for whole families of men, women, and children to go from their homes in Baltimore to truck farms in Anne Arundel county on the south side of the Patapsco river, there to engage for some weeks in strawberry and pea picking. Bembe had agreed to take a number of such families from the foot of Chester street in Baltimore city to a landing in Curtis Bay. There were about 50 in the party. They had with them their trunks and boxes, rolls of bedding, household and kitchen utensils, etc. Much of this baggage was piled on the deck of the Elisha. The collision damaged both the steamer and the bugeye. One of the passengers on the latter in some way lost her life, and a number of them received injuries more or less serious or trivial in their nature. Much of their baggage is alleged to have been lost or damaged. Bembe libeled the Avalon and the three launches. Twenty-two separate suits were brought in the state courts against the owner of the Avalon to recover for injuries done to person or property by the collision. It filed a petition in this court to limit its liability, and to require all persons having claims against it growing out of the collision to come into the proceedings it thereby instituted. It filed a libel in rem against the launches, and one in personam against their owner and against Bembe as the owner of the Elisha. By agreement all these cases have been consolidated.

The collision took place in broad daylight. The air was free from any suggestion of fog or mist. The wind was about south southwest, and blowing somewhere from 10 to 13 miles an hour. When the two vessels came in sight of each other they were moving in very nearly opposite directions. Both were in the channel—the Avalon coming up almost in the center, the Elisha going down somewhat to the west of the center. When the vessels were within half a mile or less of each other the Elisha was heading a little to the westward of the channel course, the Avalon directly upon it. The latter accordingly blew one whistle, and put its head slightly to starboard promptly thereafter steadying upon its course. One of the power boats at that time fast to the Elisha replied with one whistle, which, however, was not heard on the Avalon. Up to this time everything had proceeded according to rule. If each of the two vessels had done what each had agreed to do they would have passed each other in safety. That they would have done so is shown by the testimony of the man in launch No. 3. That launch was lashed to the port quarter of the Elisha. As the Avalon

approached, the man in it saw that the steamer would pass to the port of the bugeye. The waves from it would tend to chafe the side of his launch against the quarter of the Elisha. His boat was used, as we shall see, for carrying passengers. It had been recently painted. He did not wish to run any risks of having its paint scratched, and he accordingly for that, as well as for another reason to be hereafter mentioned, cast off from the Elisha.

It is certain that either the steamer or the bugeye did not keep its course, but went to port and thereby caused the collision. Each says the other did so. The experienced master of the Avalon was himself in the pilot house and in charge. A bright and capable young quartermaster was at the wheel. Both of them impressed me favorably. The captain had the Elisha in plain view. He saw its decks crowded with people. Deliberately to change his course so as to take his vessel into the bugeye would have been to have attempted wholesale murder in cold blood. It is suggested by the proctors for the bugeye and the launches that such change of course was not deliberate, but was made in an unwise effort to escape from the consequences of an earlier mistake in navigation. The Avalon and the Elisha were not at the time the only craft in the channel. The powerful sea-going tug Britannia, with the large four-masted schooner Addison E. Bullard in tow on a hawser of 125 fathoms in length, had started out shortly after the Elisha. It was traveling faster than the latter, and at the time of the collision the Britannia was some distance ahead of the bugeye, the Bullard some distance behind it. For the launches and the bugeye it is said that the courses upon which the Britannia and its tow and the Elisha were moving were so close together that there was not room for the Avalon safely to pass between them at the speed at which it was moving. The suggestion is made that at the last moment the master of the Avalon became fearful that he would run into the Britannia, and in attempting to avoid that result made such a change of course as carried him into the Elisha. I do not think the facts sustain this contention. Captain Dunn of the Britannia testifies that there was 400 feet between his course and that of the Elisha. Other witnesses estimate this distance as considerably less, but it is significant that no one on either the Britannia or the Bullard ever for a moment thought that there was the slightest danger that the Avalon would strike either. Moreover, when the Avalon did blow its one whistle no one on the Britannia supposed that such whistle was intended for it, and no reply was made to it. Had the Britannia been then close to the Elisha the natural inference would have been that the Avalon's signal was intended for the tug.

I am satisfied that the collision did not result from any alteration of course on the part of the Avalon. It must then have been brought about by a change in that of the Elisha. The conditions controlling the navigation of the latter were very different from those prevailing on the steamer. The Elisha's crew consisted of its master and one other man. The latter was, as he testified, occupied altogether in keeping the children of the passengers out of danger. In short, he was discharging the duties of a nurse rather than those of a sailor. The cap-

tain says he did not consider himself as responsible for the navigation of his vessel. He had hired the launch to tow him, and in his view he was in its hands. This launch was C. F. Co. No. 4. It was some 28 feet long, and of 12 horse power. It was lashed to the starboard quarter of the Elisha in such manner that its stern was beyond that of the bugeye. There was only one man on it. As its engine and wheel were at its stern, he was necessarily required to be there also. At the coroner's inquest over the body of the passenger who was killed, he testified that the trunks and baggage of the passengers were piled so high on the deck of the Elisha that he could not see over them, but that he supposed the captain of the Elisha was keeping a lookout. The latter, on the other hand, said that he did not feel bound to do so. He had not hired the other two launches. All three of them belonged to the same owner. It so happened that the Elisha was ready to start about 12:30 p. m. At that hour launches Nos. 2 and 3 were in the daily habit of going to Riverview, an excursion resort on the north side of the Patapsco river some little distance beyond Lazaretto Point. They there made a business of taking visitors to the resort out on the water for short trips. As the course of the Elisha as far as Lazaretto Point would be identical with their own, they offered to assist in towing her. Launch No. 3 made fast to her port quarter in a position similar to that occupied by No. 4 on the starboard quarter. No. 2 was the smallest of the three. It went ahead of the Elisha, and took a line from the latter's bow. Launches Nos. 2 and 3, so soon as the flotilla had passed Lazaretto Point, intended to cast off. From that point their course diverged from that of the Elisha. She was to go to the south and west —they to the north and east.

As already mentioned, according to the testimony of the man in charge of launch No. 3, his fear that the approach of the Avalon would scratch his new paint hastened the moment at which he cast off from the Elisha. He called to the captain of the latter to slacken off his line. When the request was complied with he cast off, went ahead and alongside of launch No. 2. He took a line from No. 2 and went ahead of it. About this time he says he heard the whistle from the Avalon, and answered it. He then called to the man in No. 2 to cast off the line from the Elisha and to turn to Riverview. Launch No. 2 did so, but by this time the Avalon had gotten quite close. Launch No. 3 went off to the westward. Launch No. 2 to the eastward of the steamer. Both escaped the collision. Neither the man on No. 2 nor the man on No. 3 felt themselves in any way responsible for the Elisha, in spite of the fact that it was from the latter that the Avalon's signal was answered. Each of the men in charge of these two launches testified at the coroner's inquest that he thought one whistle meant to go to port, and the man in charge of No. 2 at that time said that they all did go to port, as he, himself, certainly did.

It is now suggested that they were confused at the inquest, and did not accurately express their meaning. Both of them, however, testified in open court, as did the man in charge of the other launch, and indeed most of the other witnesses. No one of

208 F.—42

the three appeared to me to be qualified to take part in towing a vessel in frequented waters in which it was likely that its movements would have to be directed with reference to those of other ships. With three boats so manned participating in the navigation of the Elisha anything might happen. What did happen is not difficult to understand. The man on No. 3 first occupied himself and the captain of the Elisha in getting free from the latter. Then he went ahead and took the attention of No. 2 in getting a line from it, and then he told No. 2 to cast off from the bugeye. When No. 2 started to obey this direction, the one man on the Elisha besides the master busied himself in pulling in the line. The withdrawal of the launch which on the port quarter had balanced the launch on the starboard quarter, and the slackening up and casting off of the launch which had been towing in front, would, in view of the direction of the wind, have tended to throw the Elisha's head to port. Such tendency might have been controlled by the Elisha's helm or by that of launch No. 4, but the captain of the Elisha did not seem to think that any action on his part was necessary, while the man in launch No. 4 was, as he testified at the coroner's inquest, at that time engaged in oiling his engines. I have no doubt that the Elisha did change its course from one which would have carried it entirely clear of that of the Avalon to one which intersected that of the latter. Had this change not been made, there would have been no collision. The change was the result of the careless and unskillful way in which it and the launches were navigated.

It is suggested that it would have been better navigation on the part of the Avalon to have passed the Britannia and its tow port to port. With this suggestion I do not agree. The captain of the Britannia himself says there was not room between his tug and tow and the wharves on the northern side of the channel to have made such course either safe or practicable. It may be that he was not as close to those wharves as he thinks he was. Nevertheless, the wind was from the south southwest, the effect of which was to send his tow somewhat to the northward and eastward of the course of the tug. It would seem that the captain of the Avalon in not making the maneuver suggested acted wisely. In any event whether he should or should not have made the attempt was a question upon which he was entitled to exercise his own judgment.

It is also contended that the Avalon might have passed the Elisha starboard to starboard, after having given the proper signals to indicate such purpose. Here again it is sought to be wise after the event. The ordinary rule of the road is to pass port to port. There are doubtless many circumstances in which it may be departed from, and perhaps some in which it must be, but when two ships are approaching each other head on, or nearly so, it is, unless conditions are peculiar, their duty to follow it. Very shortly before the collision the Elisha was headed in the direction in which it really wanted to go, viz., slightly towards the Anne Arundel shore. Under such circumstances, had the Avalon attempted to cross the

Elisha's bow and any accident had happened, it could not have escaped liability.

It is said that if the Avalon had been somewhere other than it was, the change of course by the Elisha could have done no harm. True, but not important. There is no doubt that the Avalon was the burdened vessel. The Elisha was the privileged. Nevertheless, the latter was bound to keep its own course and speed.

It is strenuously argued that even if the Elisha had not changed its course, the Avalon would have passed close to it, and that the Avalon was going much faster than its officers now say they think it was. These contentions may be well founded, but it does not follow if they are that the Avalon was at fault. It was not bound to anticipate that the Elisha would do what the Elisha did. Nor does the testimony disclose that the Avalon can be held liable under what is called the doctrine of the last clear chance. It does not appear that after the Elisha's change of course was perceived upon the Avalon, or would have been perceived if reasonable care had been exercised, the Avalon could have done anything to avoid the collision. A very little while before the Elisha's change of course was perceived, the master of the Avalon had directed its engines to be put under half speed. After he saw the Elisha had changed its course he did not stop or do anything further to slacken the pace at which his vessel was moving. The reason given by him for not doing so is conclusive. After the change of course took place nothing he could do would have prevented a collision. He could choose between running into the Elisha or letting the Elisha run into him. Other choice he had none. If he slackened his speed he would strike the Elisha. If he did it would almost inevitably sink her with great loss of life. If he kept up his speed there was a chance that the collision would take the form it actually did, viz., that the Elisha would strike his side. The master of the latter at the very last moment attempted to go to starboard, and at the instant the vessels came together it appears probable that the head of the bugeye had begun to move in that direction. The consequences to be anticipated from a collision in which the Elisha ran into the Avalon were far less serious than those which would have almost certainly followed had the Avalon run into the Elisha. So soon as the master of the steamer saw that he would not strike the Elisha, although the Elisha would strike him, he ordered his engines stopped. He did not reverse because of the increased danger in which persons who had been thrown overboard from the Elisha would thereby be put. The Avalon was not in any wise at fault.

How is responsibility to be distributed among the Elisha and the three launches? The former says that no blame can be imputed to it. Its navigation was entirely in charge of power boat No. 4. When the control of the navigation of the tow is completely in the hands of the tug, the latter and not the former is liable for faults in such navigation, provided the tug so selected might reasonably be believed to be of such capacity and to be so equipped and manned as to be able to conduct such navigation safely. It should have been clear to any one

that in the position in which launch No. 4 was lashed to the Elisha one man on it could not safely take charge of the navigation of both the vessels. He could not keep a proper lookout, and he did not attempt to do so. The master of the Elisha could not transfer responsibility for the lives on board his vessel to one who was obviously unable safely to assume it. As the owner and master of the Elisha was one and the same person, and as he himself was the individual whose lack of care directly contributed to the disaster, his liability cannot be limited. This conclusion, however, does not relieve power boat No. 4. It undertook to do more than it was manned to accomplish. It made no attempt to arrive at a distinct understanding in advance as to what part of the navigation it would take charge of and what part was to be looked after by the crew of the Elisha, or by the other launches.

It has been urged that neither of the latter can be held liable because it is said they were not engaged to do any towing. I am persuaded that they contributed to bring about the accident. As already explained, their casting off when and as they did had a large, if not a principal, share in causing the unfortunate change of course by the Elisha. To engage in such maneuvers at the time the Avalon was swiftly approaching was, under all the circumstances, highly negligent.

The Avalon also filed a libel in personam against the Consolidated Ferry Company as the owner of the launches in question. I am informed that it is unnecessary to consider whether this company is entitled to the benefit of the limited liability provisions of law or not, as it is said that the three launches in question constitute all its assets.

It follows that Bembe and power launches 2, 3, and 4 are held solely responsible for the collision.

If it be necessary, the usual order for a reference to ascertain the amount of damages will be made.

If either Bembe or the claimant of the launches shall desire to raise the question as to primary liability as between themselves, I will hear them.